**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROXANNE CLEARY, LISA WENDLING, KIMBERLY MILLER, MARY CLARE BREIDENSTEIN, AND ROBIN CHILTON, *on behalf of themselves and all others similarly situated,*<br><br>*Plaintiffs,*<br><br>v.<br><br>**KALEIDA HEALTH, KALEIDA HEALTH PENSION GROWTH PLAN, KALEIDA HEALTH RETIREMENT PLAN COMMITTEE, BOARD OF DIRECTORS OF KALEIDA HEALTH, AND JOHN DOES 1-40,**<br><br>*Defendants.* | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**Civil Action No.**<br><br>_____ |

## CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all other similarly situated participants and beneficiaries, by and through their counsel, Christen Archer Pierrot, Esq., and Thomas and Solomon LLP, bring this class action complaint against Kaleida Health, Kaleida Health Pension Growth Plan (the "Plan"), Kaleida Health Retirement Plan Committee, Board of Directors of Kaleida Health, and John Does 1 - 40 (collectively "Defendants" or "Kaleida"), and allege as follows:

## NATURE OF ACTION

1.      This is a class action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

## JURISDICTION AND VENUE

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

3.      Venue here is proper inasmuch as this District is where the Plan is administered,

where some or all of the alleged breaches took place, where all Defendants may be found, and where all known Defendants reside. *See* ERISA § 502(e), 29 U.S.C. § 1132(e).

## THE PARTIES

### *Defendants*

4.    Defendant Kaleida Health is a New York not-for-profit corporation, established in 1998, with its headquarters and principal place of business located at 726 Exchange Street, Buffalo, New York 14210.

5.    Defendant Plan is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35).

6.    Kaleida Health is the sponsor and a named fiduciary of the Plan, within the meaning of ERISA §§ 3(16)(A)-(B), 402(a), 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), and is sued in each of these capacities.

7.    Kaleida Health acts through the Defendant Board of Directors of Kaleida Health ("Board of Directors") and its individual members.

8.    Kaleida Health, through its Board of Directors, authorized the adoption of the Plan.

9.    Kaleida Health, through its Board of Directors, has authority to appoint members to or remove members from the Retirement Plan Committee (as defined below) and has a fiduciary duty to monitor those individuals, the Retirement Plan Committee and the Plan itself.

10.    Kaleida Health, through its Board of Directors, has or claims to have delegated certain authority, duties and/or responsibilities to the Retirement Plan Committee and has a fiduciary duty to monitor those individuals, the Retirement Plan Committee and the Plan itself.

11.     Such authority to appoint, retain, remove and/or delegate to the Plan fiduciaries constitutes discretionary authority or control over the management or administration of the Plan.

12.     The responsibility for appointing and removing Retirement Plan Committee members carries with it an accompanying duty to monitor the appointed fiduciaries, to ensure that they were complying with the terms of the Plan and ERISA's statutory standards.

13.     Furthermore, that monitoring duty carries with it a responsibility to take action upon discovery that an appointed fiduciary is not performing properly.

14.     The Board of Directors includes the Board of Directors of Kaleida Health, as well as all individuals who have served on the Board of Directors at all relevant times.

15.     Individuals who served on the Board of Directors of Kaleida between 1999 and the present are not currently known to Plaintiffs, and those individuals are named as John Does 1-20.

16.     The Board of Directors authorized the adoption of the Plan.

17.     The Board of Directors exercises discretionary authority over the management and/or administration of the Plan.

18.     The Board of Directors has authority to take action as may be necessary to correct any defect, omission or inconsistency in the Plan.

19.     The Board of Directors has authority to appoint members to or remove members from the Retirement Plan Committee and has a fiduciary duty to monitor those individuals, the Retirement Plan Committee and the Plan itself.

20.     The Board of Directors has or claims to have authority to delegate authority, duties and/or responsibilities including fiduciary duties or responsibilities, under the Plan.

21.     The Board of Directors has or claims to have delegated certain authority, duties

and/or responsibilities to the Retirement Plan Committee and has a fiduciary duty to monitor those individuals, the Retirement Plan Committee and the Plan itself.

22.     Such authority to appoint, retain, remove and/or delegate to the Plan fiduciaries constitutes discretionary authority or control over the management or administration of the Plan.

23.     The responsibility for appointing and removing committee members carries with it an accompanying duty to monitor the appointed fiduciaries, to ensure that they were complying with the terms of the Plan and ERISA's statutory standards.

24.     Furthermore, that monitoring duty carries with it a responsibility to take action upon discovery that an appointed fiduciary is not performing properly.

25.     The Board of Directors has a continuing duty, under the Plan and under ERISA, to review and monitor the performance of any fiduciary or other person to whom duties have been delegated or allocated.

26.     To the extent any one or more members of the Board of Directors was also a member of the Retirement Plan Committee, the Board of Directors therefore had actual or constructive knowledge to determine that other fiduciary Defendants were acting in breach of their fiduciary duties.

27.     Defendant Kaleida Health Retirement Plan Committee ("Committee") is and was at all relevant times the Plan Administrator for and a named fiduciary of the Plan, within the meaning of ERISA §§ 3(16)(A)-(B), 402(a), 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), and is sued in each of these capacities.

28.     Individuals who served on the Committee of Kaleida between 1999 and the present are not currently known to Plaintiffs, and those individuals are named as John Does 21-40.

*Named Plaintiffs*

29.     Named Plaintiff Roxanne Cleary resides in Clarence Center, New York and has been employed as a Registered Nurse at Kaleida Health, or its predecessors, for approximately 29 years, from 1992 and continuing through the present.

30.     At all relevant times during her employment and prior to July 1, 1999, Plaintiff participated in one of the Plan's predecessor Legacy Plans, as defined below.

31.     At all relevant times during her employment subsequent to July 1, 1999, Plaintiff has participated in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), because she has a claim to vested benefits under the terms of the Plan, including Plan terms implied by law or under the terms of the Plan once it is reformed as required by law and/or is administered in accordance with the law.

32.     Ms. Clearly is currently 62 years old.

33.     Named Plaintiff Lisa Wendling resides in Ransomville, New York and has been employed as a Registered Nurse at Kaleida Health, or its predecessors, for approximately 30 years, from 1991 and continuing through the present.

34.     At all relevant times during her employment and prior to July 1, 1999, Plaintiff participated in one of the Plan's predecessor Legacy Plans.

35.     At all relevant times during her employment subsequent to July 1, 1999, Plaintiff has participated in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), because she has a claim to vested benefits under the terms of the Plan, including Plan terms implied by law or under the terms of the Plan once it is reformed as required by law and/or is administered in accordance with the law.

36.     Ms. Wendling is currently 55 years old.

37.     Named Plaintiff Kimberly Miller resides in Clarence Center, New York and has been employed as a Registered Nurse at Kaleida Health, or its predecessors, for approximately 33 years, from 1988 and continuing through the present.

38.     At all relevant times during her employment and prior to July 1, 1999, Plaintiff participated in one of the Plan's predecessor Legacy Plans.

39.      At all relevant times during her employment subsequent to July 1, 1999, Plaintiff has participated in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), because she has a claim to vested benefits under the terms of the Plan, including Plan terms implied by law or under the terms of the Plan once it is reformed as required by law and/or is administered in accordance with the law.

40.     Ms. Miller is currently 54 years old.

41.     Named Plaintiff Mary Clare Breidenstein resides in Lancaster, New York and has been employed as a Surgical Technician or Registered Nurse at Kaleida Health, or its predecessors, for approximately 35 years, from 1986 and continuing through the present.

42.     At all relevant times during her employment and prior to July 1, 1999, Plaintiff participated in one of the Plan's predecessor Legacy Plans.

43.      At all relevant times during her employment subsequent to July 1, 1999, Plaintiff has participated in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), because she has a claim to vested benefits under the terms of the Plan, including Plan terms implied by law or under the terms of the Plan once it is reformed as required by law and/or is administered in accordance with the law.

44.     Ms. Breidenstein is currently 60 years old.

45.     Named Plaintiff Robin Chilton resides in North Tonawanda, New York and has

been employed as a Registered Nurse at Kaleida Health, or its predecessors, for approximately 39 years, from 1982 and continuing through the present.

46.     At all relevant times during her employment and prior to July 1, 1999, Plaintiff participated in one of the Plan's predecessor Legacy Plans.

47.     At all relevant times during her employment subsequent to July 1, 1999, Plaintiff has participated in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), because she has a claim to vested benefits under the terms of the Plan, including Plan terms implied by law or under the terms of the Plan once it is reformed as required by law and/or is administered in accordance with the law.

48.     Ms. Chilton is currently 61 years old.

## STATEMENT OF FACTS

### The Traditional Benefit Formula

49.     At all times prior to July 1, 1999 (the "conversion date" or "date of conversion"), Named Plaintiffs and class members participated in one of the following traditional pension plans: The Retirement Plan for the Employees of the Buffalo General Hospital ("BGH Legacy Plan"); The Pension Plan for Non-Union Employees of Millard Fillmore Hospital and The Pension Plan for Union Employees of Millard Fillmore Hospital ("MFH Legacy Plans"); or The Retirement Plan for Employees of DeGraff Memorial Hospital ("DGMH Legacy Plan," and collectively with the BGH Legal Plan and the MFH Legacy Plans, the "Legacy Plans").

50.     Each Named Plaintiff (and other members of the Class) accrued benefits under one of the Legacy Plans' traditional defined benefit formulas, which calculated and paid benefits according to formulas that based accruals on a specified percentage of an employee's final average compensation and service.

51.     The MFH Legacy Plans generally provided for an unreduced monthly pension benefit, commencing at either age 62 with 40 or more years of service, or normal retirement age (age 65), equal to the sum of .85% of the first $7,800 of final average compensation *plus* 1.5% of the final average compensation in excess of $7,800 for each year of credited service, to a maximum of 35 years.

52.     The BGH Legacy Plan generally provided for a monthly pension benefit commencing at normal retirement age equal to the sum of 1.25% of the amount of the participant's eligible compensation not in excess of the participant's covered compensation, *plus* 1.75% of the amount of the participant's eligible compensation in excess of the participant's covered compensation for each year of credited service, to a maximum of 35 years.

53.     The DGMH Legacy Plan generally provided for an annual retirement benefit at normal retirement age equal to the sum of various percentages of various compensation earned in various plan years.

54.     Each of the above-referenced Legacy Plans also provided for reduced early retirement benefits for participants who had completed ten years of service and were between the ages of 55 and 64.

### The Creation of Kaleida Health and the Kaleida Health Pension Growth Plan

55.     In early 1998, Buffalo General Hospital, Children's Hospital, and the Millard Fillmore Hospitals merged and became known as CGF Health System ("CGF").

56.     On June 10, 1998, CGF entered into an Effects Bargaining Master Agreement ("EBMA") with various unions (the "Unions"), including the Communication Workers of America, AFL-CIO Nurses United, Local 1168.

57.     Among other things, the EBMA was negotiated to provide that during its duration,

CGF would recognize the Unions' representation of various units within CGF upon the Unions obtaining signatures from 60% or more of the eligible employees in such unit.

58.     In or around June 1999, CGF became known as Kaleida Health.

59.     By means of amendment(s) to the Legacy Plans, effective July 1, 1999 (collectively known as the "Amendment"), Defendants simultaneously:

> (a) merged the MF Legacy Plans and the DGMH Legacy Plan into the BGH Legacy Plan, with the BGH Legacy Plan being the sole surviving plan;
>
> (b) renamed the BGH Legacy Plan as the Kaleida Health Pension Growth Plan (previously defined as, the "Plan"); and
>
> (c) amended the Plan to include newly adopted cash balance formula provisions for all participants who were not represented by the Unions as of July 1, 1999 ("Cash Balance Provisions").

60.     Legacy Plan participants who were employed in a collectively bargained position for which continued coverage under a Legacy Plan was mandated pursuant to a collectively bargained agreement as of July 1, 1999, continued to be covered under the terms of their respective Legacy Plan, which were incorporated into the Plan as Appendices A through D.

61.     Additionally, units recognized as being represented by the Unions by signing Union cards prior to July 1, 1999, pursuant to the EBMA, also continued to have their pension benefits determined under the terms of their respective Legacy Plan, despite not having mandated continued coverage pursuant to a collective bargaining agreement as of July 1, 1999, inasmuch as pension benefits are a mandatory subject of bargaining, thereby precluding Defendants from unilaterally changing the terms of same.

62.     Further, new employees hired subsequent to the date of conversion also became participants in a Legacy Plan where that employee joined a unit that was represented by one of the Unions prior to the date of conversion. This practice continued until January 1, 2009, when such

Legacy Plans were closed to new participants.

63.     Thus, there are individuals hired after Named Plaintiffs and other class members who are currently participating in a Legacy Plan and who are earning substantially greater pension benefits than Named Plaintiffs and other class members, despite potentially having significantly fewer years of service.

64.     All other individuals, including Named Plaintiffs, who did not yet have Union representation as of the date of conversion would be subject to the Cash Balance Provisions of the Plan.

65.      Kaleida used an "opening account balance" conversion method which froze accruals under the Legacy Plan benefit formula as of June 30, 1999, and then opened new hypothetical or notional cash balance accounts with beginning balances for each participant in amounts that allegedly represented the actuarial present value of each participant's frozen accrued benefit earned under the Legacy Plan formula as of the time of conversion and which would have been payable at normal retirement age.

66.     Plan participants who were not in collectively bargained positions as of July 1, 1999, *i.e.,* Named Plaintiffs and the members of the proposed class, received initial opening account balances in their cash balance account based upon Kaleida's determination of the purported "actuarial equivalent" lump sum value of their accrued benefits, as of June 30, 1999, under the Legacy Plans' prior formulas.

67.     Compensation credits were and are credited on a quarterly basis according to a schedule set forth in the Plan document which calls for credits of between 3% and 5% of a participant's pay depending on a participant's years of credited service with Kaleida.

68.     From July 1, 1999, and continuing until sometime in 2008, participants' notional

accounts were also adjusted on a quarterly basis by fluctuating "interest credits" equal to the one-year Treasury Bill Rate plus 1%. In or around November 2008, the Plan was amended to provide for a minimum interest rate equal to the rate necessary for the compound interest on the cash balance account for the prior five years and the current year to be at least 25%.

69.     Employees who were hired after the conversion date into units which were not represented by the Union as of July 1, 1999, and/or who had never been participants in or accrued benefits under the Legacy Plans, had initial account balances of zero.

### The Wear-Away Effect, i.e., Frozen Benefit Accruals

70.     In calculating each participant's opening account balance, Kaleida undervalued the "actuarial present value" of each participant's accrued benefit, as of June 30, 1999, by:

> (a) Ignoring the value of each participant's right under his/her respective Legacy Plan to retire early with either an unreduced or slightly reduced benefit;

> (b) Using an interest rate of 5.25% to discount the value of the accrued benefit at normal retirement age to present value;

> (c) Using a mortality discount that further reduced opening account balances to reflect the probability that a participant would die before reaching age 65; and

> (d) In some cases, using an improper accrual fraction, which penalized every participant who would have in excess of 35 years of service at retirement age inasmuch as 35 years of service credit was the maximum service credit allowed for benefit accruals under the Legacy Plans.

71.     The result was that participants' cash balance account opening balances were in amounts significantly lower than the amounts required to pay the participants the benefits that each had already accrued under the Legacy Plans at their normal retirement age – so that in a very real sense, the participants started their participation under the Cash Balance Provisions of the Plan in a hole.

72.     Because they started in a hole, participants subject to the Cash Balance

Provisions in the Plan and who had previously accrued a benefit under the Legacy Plans experienced a rate of benefit accrual of *zero* for varying periods of time until the balances of their cash balance accounts caught up with the already earned value of their frozen accrued benefit payable at normal retirement age.

73.     This phenomenon, known as "wear-away," refers to any period of time where a plan participant appears to be accruing additional pension benefits but is really just re-earning the value of the pension benefits that she or he had previously accrued under the prior plan.

74.     Prior to 2006, building wear-away into a plan conversion was not per se unlawful as long as, among other things, the plan explicitly disclosed the wear-away and its consequences to the plan participants.

75.     However, in 2006, Congress made the wear-away strategy, even where the plan made adequate and full disclosure, unlawful. *See* 29 U.S.C. § 1054(b)(5)(B)(iii).

76.     Wear-away is not an accident, but rather – until it was outlawed – was an integral and cost-savings mechanism deliberately built into cash balance plan conversions.

77.     It is not until after participants "wear-away" their already-accrued frozen Legacy Plan benefits, that these participants will experience a positive pension benefit accrual rate.

78.     That is precisely what occurred here to Named Plaintiffs and the members of the proposed class.

79.     Kaleida's method of establishing opening account balances guaranteed that each Named Plaintiff's and proposed class member's opening account balance would be, and in fact was, smaller than the amount to which the individual would have been entitled to receive at normal retirement age had s/he terminated employment on June 30, 1999. Defendants knew or should have known this at all relevant times leading up to and after the date of conversion.

80.     As a result of the opening account balances being established at levels below the values of the pension benefits already accrued before the conversion, there were substantial periods of time after the conversion when Named Plaintiffs and other members of the proposed class did not accrue any additional benefits under the Plan. Defendants knew or should have known this at all relevant times leading up to and after the date of conversion.

### Significantly Reduced Benefit Accruals

81.     In addition to effectively freezing future benefit accruals for periods of time, Defendants' conversion from Legacy Plans to the Cash Balance Provisions of the amended Plan also significantly reduced the rate of future benefit accruals for Named Plaintiffs and other members of the proposed class.

82.     Prior to July 1, 1999, Legacy Plan participants were provided with "Personal Retirement Income Profile" statements from time to time.

83.     These statements not only indicated the amount of a participant's accrued benefit as of January 1st of a particular plan year, but also what such participant's projected retirement benefit would be if all things stayed the same and the participant worked through normal retirement age earning the same compensation.

84.     Upon information and belief, no such statements were provided for plan years 1998 or 1999.

85.     As an example, the January 1, 1996 statement for Named Plaintiff Chilton, indicated that her accrued benefit, as of December 31, 1995, was $503.09 per month and, further, that her "[e]stimated monthly retirement benefit projected to her normal retirement date," assuming that she continued to earn the same compensation as in plan year 1995, would be $1,735.39 per month, or more than three times her then already accrued benefit.

86.     However, because the Legacy Plans used benefit formulas that were based on final average salary, as Chilton's annual compensation grew over the course of her career, so would her retirement benefit.

87.     At the time of conversion, and pursuant to the Legacy Plan formula, Chilton's accrued benefit was $875.53. Her projected retirement benefit if she continued to work through normal retirement age and earn income in an amount equivalent to her 1998 compensation would have been $1,761.11, or more than double what she had already accrued at that time.

88.     As of December 31, 2020, Chilton's final average salary is $88,171.80.

89.     Under the Legacy Plan formula, Chilton's monthly retirement benefit would now have been approximately $3,709.02.

90.     Chilton would have been entitled to receive her unreduced retirement benefit at the age of 62, because she would have had 40 years of service, thereby satisfying the unreduced early retirement provisions of the Legacy Plan.

91.     However, as of March 31, 2021, Chilton's estimated monthly benefit under the Plan, if she were to immediately begin receiving benefits at age 61, was $803.

92.     Given that Chilton was entitled to an accrued benefit of $785.53 at the time of conversion, Chilton did not accrue virtually any new retirement benefits under the Plan after July 1, 1999.

93.     The conversion of Chilton to the Cash Balance Provisions of the Plan reduced her anticipated future benefit accruals from approximately $3,000/month to approximately $0-$100/month.

94.     Despite working an additional 22 years since the conversion, Chilton has little to no new pension entitlements beyond what she was already entitled to had she never worked another

day after June 30, 1999.

95.     The other named plaintiffs and class members similarly experienced a significant reduction in their expected future accruals as a result of the conversion, working for years without any additional retirement benefits.

### *Plan Communications Regarding 1999 Amendment*

96.     Beginning in early 1999 Kaleida issued communications to its employees that it knew contained materially false and misleading statements and omissions concerning amendments to the Legacy Plans and/or the Plan.

97.     Kaleida prepared and distributed brochures, entitled *Your Spectrum of Choices*, in February and March 1999.

98.     The February 1999 brochure announced that a "new Kaleida Health compensation program, called 'Your Spectrum of Choices,' would take effect on July 1, 1999."

99.     Readers were told that the program has four components of compensation:

> Pay/Recognition,
> Health/Income Protection,
> Retirement,
> Work/Life Balance.

100.    This brochure, at page 3, tells readers that for retirement, Kaleida provides two plans, consisting of a "Savings Account Plan" and a "Pension Account Plan – fully funded by Kaleida, to establish a strong foundation for your financial future."

101.    This brochure advises that:

> These plans help take the mystery out of pension benefits. Both provide regular, easy-to-read account statements so that you can see exactly how much you have invested for the future and how much Kaleida contributes – and watch that nest egg grow over the years . . .
>
> No more waiting until age 65 to see how much benefit you will have!

102.    One month later, Kaleida distributed another brochure, this time focused on a "New Retirement Program," taking effect on July 1, 1999.

103.    Readers are informed that "[b]oth plans create individual accounts for [them] so [they] can watch [their] investments grow throughout [their] career with Kaleida Health."

104.    The March 1999 brochure also includes a question and answer section with then Senior Vice President of Human Resources, Tom Fentner, who theorized that "[r]etirement plans are simply mystifying to most people," and that "[i]n the past, pension benefits were like a 'black box' that few employees understood and wasn't opened until retirement."

105.    He tells his readers that "[t]he new program is like a picture window into the savings that are growing throughout your career at Kaleida Health. You always know how much you have!"

106.    Fentner is asked the question: "What happens to the pension and savings benefits an employee already may have under a current plan at Kaleida Health?"

107.    He responds:

> Current plans will be in effect through June 30, 1999.
>
> Then, on July 1, 1999, those old plans cease and the new plans take effect. The most important thing to say about the transition is: **you will not lose any benefit you have already earned under a current pension or savings plan**.

108.    The March 1999 brochure also relays how the retirement program is good for Kaleida, deceptively asserting that it provides one savings program for all eligible employees; that it responds to the needs of a more mobile workforce; that it lets employees participate in saving for their future; and that it provides employees choice and control which is "necessary to attract and retain the professional work-force Kaleida needs."

109.    Defendants prepared a letter, dated June 11, 1999, addressed to "Kaleida Health

Employee" which purports to constitute the notice required under ERISA § 204(h).

110.    This letter provided:

On July 1, 1999, the new Kaleida Health Pension Growth Plan will become effective for all eligible employees, as explained in *Your Spectrum of Choices* enrollment kit. This notice is legally required to inform you that the Kaleida Health Board of Directors has formally adopted the Pension Growth Plan effective July 1, 1999. If you are currently a participant in the Retirement Plan for the Employees of the Buffalo General Hospital, the Pension Plan for Non-Union Employees of Millard Fillmore Hospital, or the Retirement Plan for Employees of DeGraff Memorial Hospital, you will no longer accrue benefits under those plans after June 30, 1999. The pension benefits you earned through June 30, 1999 will be transferred into the Pension Growth Plan as your opening balance.

If you are eligible to participate in the Pension Growth Plan you will accrue benefits under that plan beginning July 1, 1999.

## CLASS ACTION ALLEGATIONS

111.    Named Plaintiffs and class members' claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

112.    The Rule 23 class is defined as follows:

All persons, and the beneficiaries and estates of such persons, who became participants with an opening account balance greater than $0 in the Cash Balance Provisions of the Plan on or after July 1, 1999, and who were either paid a benefit from the Plan after July 1, 1999, or are still entitled to a benefit from the Plan.

113.    The class action is maintainable under subsections (1), (2), (3) and (4) of Rule 23(a).

114.    The class is so numerous that joinder of all members is impracticable. The size of the class is believed to be over 50.

115.    Common issues of law and fact exist as to all members of the class and predominate over any questions affecting only individual class members. Among the common issues of law and fact are the following:

- Whether Defendants are fiduciaries of the Plan;
- Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;
- Whether Defendants violated ERISA's strict fiduciary standards by preparing and disseminating participant communications with the intent to conceal the wear-away and/or that had the effect of concealing wear-away;
- Whether, as a result of the intentional and/or reckless misrepresentations and omissions made by Defendants in Plan documents and other Plan communications, class members were ignorant of the truth about their retirement benefits; and
- Whether Defendants violated ERISA § 204(g) by distributing benefits in amounts less than a participant's previously accrued benefit as of the conversion date;

116. These common questions of law and fact also predominate over any questions affecting only individual class members.

117. The Named Plaintiffs' claims are typical of the claims of other members of the Class because Named Plaintiffs, like other class members, became participants in the Plan with an opening account balance greater than $0 on or after July 1, 1999 and have suffered injuries due to Defendants' imprudence. Defendants treated Named Plaintiffs the same as members of the class with respect to the Plan.

118. Named Plaintiffs and their counsel will fairly and adequately protect the interests of the class. Named Plaintiffs have no interest antagonistic to the class and have retained counsel experienced in complex class action litigation.

119. Class counsel, Christen Archer Pierrot, Esq., and Thomas & Solomon LLP are qualified and able to litigate Named Plaintiff and class claims.

120. Christen Archer Pierrot, Esq., licensed and admitted to practice in New York State in 2004, concentrates her practice in the areas of ERISA and employee benefit litigation.

121. Thomas & Solomon LLP concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation.

122.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy and avoids duplication by allowing these claims to be prosecuted in a single action. Named Plaintiffs and class members lack the resources to adequately prosecute separate claims.

123.    The class action is also maintainable under subsection (2) of Rule 23(b) because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and other equitable relief in favor of the class as a whole.

124.    Moreover, the class action is maintainable under subsection (3) of Rule 23(b) because the Named Plaintiffs and class members seek to resolve common questions of law and fact that predominate among the Named Plaintiffs and class members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

125.    The Class is also maintainable under Rule 23(c)(4) because resolution of the common issues will significantly advance the litigation or entitle Plaintiffs to injunctive relief.

## FIRST CAUSE OF ACTION
### Violation of ERISA § 204(h)

126.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent causes of action as if fully restated herein.

127.    In 1999, ERISA § 204(h) provided that:

> A plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to . . . each participant in the plan . . .

128.    Under the law, an amendment to a defined benefit plan affects the rate of future benefit accrual if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age. *See* 26 C.F.R. §1.411(d)-6, Q&A-5(a)(1). One makes this

determination by comparing the "amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan as amended, with the amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan prior to amendment." *See* 26 C.F.R. §1.411(d)-6, Q&A-7.

129.    The Amendment provided for a significant reduction in the rate of Named Plaintiffs' and proposed class members' future benefit accruals within the meaning of ERISA §204(h), 29 U.S.C. §1054(h), inasmuch as the accrual formulas under the Legacy Plans are far more generous than under the Cash Balance Provisions of the Plan and, further, because of the wear-away effect described above, which literally resulted in periods of time where a participant was not accruing *any new benefits*.

130.    Notwithstanding the law's requirements, Defendants failed to provide Named Plaintiffs or members of the proposed class with a written notice which set forth the text of the voluminous Amendment which created the Plan and its newly adopted Cash Balance Provisions.

131.    Nor did the Defendants fairly or sufficiently summarize the Amendment in a manner calculated to be understood by the average plan participant, which necessarily would have to include disclosure of both the significant reduction in the rate of future benefit accruals *and* the wear-away periods of time within which no benefits would be accrued.

132.    Any written notice that was provided to Named Plaintiffs or members of the proposed class did not state or otherwise disclose that they would or could experience a significant reduction in or complete loss of the rate of future benefit accrual.

133.    Any written notice that was provided contained false or misleading material misstatements or omissions that concealed that the Amendment provided for a significant reduction in the rate of future benefit accrual or concealed the extent to which it did so. Any such

purported notice gave no notice or effective notice of the wear-away problem, that participants' rate of future benefit accrual would be reduced to zero, or that under the Amendment participants would not be earning additional retirement benefits for varying periods of time after the conversion and could work for years after the conversion and still not have any more benefits than those to which they already were entitled under the Legacy Plan formulas.

134.     Any written notice that was provided was written in a manner that was designed to lead, and which would have led, an average Plan participant to mistakenly think, assume or otherwise believe that following the July 1, 1999, cash balance conversion, the participant's previously accrued benefit would continue to grow for each period of post-conversion service with Kaleida equal to the increase in his or her cash balance account.

135.     The clear implication of any written notice that was provided, including the June 11, 1999 letter, is that (a) all employees would no longer accrue benefits under the Legacy Plans; and (b) a participant's already accrued benefit would be preserved and would continue to grow each year after the cash balance conversion by an amount equal to the increase in his or her cash balance account.

136.     Any written notice provided also failed to explain that (a) every other employee covered under a Legacy Plan would continue to be covered under such Legacy Plan for as long as s/he remained in bargaining unit positions for which collective bargaining agreements provided for such coverage; or (b) individuals who wished to retain their Legacy Plan participation either needed to organize as a bargaining unit, or transfer to a position already covered under a bargaining unit and for which Legacy Plan participation applied, before July 1, 1999.

137.     Indeed, had Named Plaintiffs and the class known that they would have been able to continue as eligible employees in their Legacy Plans after July 1, 1999, as long as 60% of their

unit had signed cards before that date, they would have undertaken efforts to sign such cards.

138.    For example, the Registered Nurses at Millard Filmore Gates Hospital signed their Union cards in March 1999, and, in turn, they remained in the MFH Legacy Plans following July 1, 1999, despite their collective bargaining agreement not being officially negotiated until late October 2000.

139.    Instead, any written notice provided represented that everyone would stop accruing benefits under the Legacy Plans and start accruing benefits under the Plan based on pay and interest credits.

140.    Any written notice provided did not disclose that Legacy Plans were actually merged into the Pension Growth Plan and would continue for certain employees and/or new hires. Nor did it disclose that only some Kaleida employees would be subject to the Cash Balance Provisions of the Plan after July 1, 1999.

141.    Any written notice provided was intended to, and did, lead an average participant to think that her "benefit" under the Legacy Plan was properly preserved under the new Plan; that she could monitor the increase in her benefit entitlement simply by watching the account grow; and that the account – and therefore her benefit – would indeed grow each year by the amount of the "yearly contribution" Kaleida would make to the account. But all of this was false: a Plan participant's already accrued benefit was not adequately reflected in a participant's opening account balance and the growth in the account balance would not necessarily represent an increase in the participant's benefit entitlement because the account balance had no new "value" unless and until employees worked long enough to wear-away the value of their benefit already accrued under the Legacy Plan. Defendants knew all of this, and accordingly knew that the representations in the letter were false and misleading.

142.    Defendants' failure to notify Named Plaintiffs and other Plan participants of a significant reduction in the rate and/or a freeze of future benefit accruals ("wear-away") in conformance with statutory requirements 15 days prior to the July 1, 1999, effective date of the Amendment violated the ERISA §204(h), 29 U.S.C. § 1054(h), prohibition on such Plan amendments in the absence of such notice.

143.    Accordingly, pursuant to ERSIA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed class seek and are entitled to relief, including nullification of the Amendment, or reformation of the Amendment and/or the Plan to conform the terms to provide Named Plaintiffs and other class members with the benefits that they believed they were receiving under the Plan, to wit, that the accrued benefit under the new Cash Balance Provisions of the Plan would include and protect all previously accrued benefits under the Legacy Plan, including early retirement benefits, and that benefits under the Cash Balance Provisions of the Plan would begin accruing immediately and would do so at rates comparable to those under the Legacy Plan, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

## SECOND CAUSE OF ACTION
### *Violation of ERISA §102*

144.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent causes of action as if fully restated herein.

145.    Throughout the relevant time, ERISA § 102, 29 U.S.C. § 1022 has required that participants be furnished with a summary plan description ("SPD") that is "written in a manner calculated to be understood by the average plan participant," ERISA § 102(a), 29 U.S.C. § 1022(a), is "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," *id.,* and includes the plan's eligibility requirements,

as well as the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." ERISA § 102(a)-(b), 29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

146. Defendants' failure to explain the full import of the Amendment and its newly adopted Cash Balance Provisions in an SPD distributed to plan participants, including but not limited to a complete explanation of the wear-away effect and legally required continued availability of subsidized early retirement subsidies, violated and violates the minimum requirements for SPDs set forth in ERISA §102, 29 U.S.C. § 1022 and its corresponding regulations set forth under 29 C.F.R. § 2520.102.

147. In connection with the Amendment, Defendants also failed to provide a summary of material modifications to the plan participants as required by 29 C.F.R. § 2520.104b-3.

148. At all relevant times prior to, in the event the communications prior to the conversion are considered SPDs, and subsequent to the date of conversion, Defendants have issued SPDs that were and are not "written in a manner calculated to be understood by the average plan participant," were and are not "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights" under the Plan, and did and do not disclose the existence or extent of the wear-away effect, or other "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," such as a Legacy Plan participant's (a) transfer from a collectively bargained position to a non-collectively bargained position prior to the conversion date, or (b) failure to be and/or remain in a collectively bargained position at all times on and after the conversion date.

149. The SPDs contain and contained materially false and misleading statements and omissions regarding Named Plaintiffs' and the proposed class members' benefit accruals and rate of benefit accruals under the amended Plan, all of which were intentionally designed to

mislead participants about and/or conceal the existence and extent of the wear-away effect and to prevent Plan participants from discovering that Defendants had failed to disclose and had misled them about the existence of wear-away.

150.    Kaleida converted Named Plaintiffs' and class members' Legacy Plans to the Cash Balance Provisions of the Plan, effective July 1, 1999, and did so using a conversion method that not only severely reduced the rate of future benefit accruals for most Cash Balance participants, but also froze a participant's pension accruals until such time that the participant was no longer in a period of "wear-away."

151.    Despite Defendants' actions, they deliberately described the conversion in a manner that would lead participants to mistakenly, but reasonably, believe that they would not only retain the full value of their previously accrued benefits, including early retirement benefits, but that they would immediately begin earning new benefits under the Plan at a rate that was not significantly lower than they had been earning under the prior Legacy Plan Formulas.

152.    Defendants knew that every participant with an opening account balance in the Cash Balance Provisions of the Plan as of June 30, 1999 and who continued in service on or after July 1, 1999 would earn no additional retirement benefits under the Plan for some period of time following the effective date of the 1999 amendment – *i.e.*, that every Plan participant who is a member of the proposed class would experience a period of wear-away following the effective date of the cash balance conversion. Named Plaintiffs and every member of the proposed class did in fact experience a period of wear-away following the effective date of the cash balance conversion.

153.    Defendants intentionally undertook to conceal these facts from Named Plaintiffs and the members of the proposed class via omissions and/or misleading communications.

154.     Kaleida's false and misleading statements and omissions regarding wear-away and protected benefit accruals were and are self-concealing and were (and continue to be) part of Kaleida's attempt to fraudulently conceal the underlying ERISA violations alleged here.

155.     For example, in addition to the aforementioned false and misleading Plan communications, including the February and March 1999 brochures, entitled *Your Spectrum of Choices*, in an undated, but more recent summary plan description, Kaleida tells its readers that the "Kaleida retirement program makes good sense for you" because:

> You can actually watch your retirement savings grow year after year. And, unlike traditional pension plans which don't grow significantly in value until you're near retirement age, your Kaleida accounts build steadily throughout your career.

156.     Kaleida not only misrepresented the ability to watch one's retirement savings grow, but also blatantly misrepresented how traditional pension plans work inasmuch as ERISA requires all retirement plans, including traditional pension plans, to accrue benefits relatively evenly over the course of one's credited service under a plan.

157.     Kaleida does not mention the cost savings of the Cash Balance Provisions of the Pension Growth Plan as one of its benefits.

158.     These examples of the false and misleading statements and omissions made by Defendants were not isolated incidents, but part of a pattern of fraud and fraudulent concealment found in most if not all of Kaleida's communications with participants about the Cash Balance Provisions of the Plan, designed in part to avoid incurring the liability that may result if one or more of the claims made here are successful.

159.     Accordingly, pursuant to ERSIA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including, but not limited to, reformation of the Plan to conform its terms to provide Named Plaintiffs and other class

members with the benefits that they believed they were receiving under the Plan, to wit, that the accrued benefit under the new Cash Balance Provisions of the Plan would include and protect all previously accrued benefits under the Legacy Plan, including early retirement benefits, and that benefits under the Cash Balance Provisions of the Plan would begin accruing immediately and would do so at rates comparable to those under the Legacy Plan, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

### THIRD CAUSE OF ACTION
*Violation of ERISA § 404(a)*

160.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent causes of action as if fully restated herein.

161.     Defendants breached their strict fiduciary duties under ERISA § 404(a) by intentionally, recklessly or negligently making the materially false and misleading statements and omissions described above, both before and after the adoption of the 1999 amendment; by intentionally, recklessly or negligently violating ERISA §§ 102, 204(h), and 404(a); and by fraudulently concealing or attempting to fraudulently conceal those violations and the violations of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), as described above.

162.     ERISA imposes fiduciary duties of loyalty, care, and prudence upon Defendants as fiduciaries to the Plan. These fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

163.     Under ERISA § 404(a)(1), a fiduciary is not permitted to balance the interests of plan participants and the plan's sponsor: the focus on participants must be "exclusive." 29 U.S.C. § 1104(a)(1).

164.     Both before and following the purported effective date of the Amendment, the

Defendants intentionally and/or recklessly made and continued making materially false and misleading statements and omissions designed to (and/or that did in fact) conceal the Plan's wear-away effect; and designed to (and/or that did in fact) prevent Plan participants from discovering that Defendants had failed to disclose to and had misled them about the existence of wear-away and about how the rate of benefit accrual under the Plan was significantly less than under the Legacy Plan(s) .

165.   The intentional and/or reckless misrepresentations and omissions made by Defendants in Plan documents and other Plan communications, constitute a breach of fiduciary duty under ERISA § 404(a).

166.   Further, Named Plaintiffs and the members of the proposed class were harmed by Defendants' violations of law and the false or misleading statements and omissions referenced above.

167.   Defendants' failure to provide notice of the significant reduction in the future rate of benefit accrual in accordance with the requirements of ERISA § 204(h), 29 U.S.C. § 1054(h), failure to provide adequate and non-misleading SPDs in accordance with the requirements of ERISA § 102, 29 U.S.C. § 1022, and corresponding breaches of fiduciary duty for those failures, harmed Named Plaintiffs and other members of the proposed class, including by depriving them of the right to the information required by ERISA §§102, 204(h) and 404, and the opportunity to contest or react to those changes with that information; by depriving them of the opportunity to benefit from action employees may have taken as a group to contest or protest the changes (*e.g.*, by demanding higher benefits and/or obtaining timely Union representation); by depriving them of the greater benefits (and/or less significant reductions) that may have resulted had the Defendants fully and honestly disclosed the entirety of the effects of the Amendment; and by

depriving them of the opportunity to leave their employment with Kaleida and work in other employment wherein they could have accrued additional pension benefits, among other things.

168.    Accordingly, pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed class seek and are entitled to relief, including nullification of the Amendment, reformation of the Amendment and/or the Plan to conform the terms to provide Named Plaintiffs and other class members with the benefits that they believed they were receiving under the Plan, to wit, that the accrued benefit under the new Cash Balance Provisions of the Plan would include and protect all previously accrued benefits under the Legacy Plan, including early retirement benefits, and that benefits under the Cash Balance Provisions of the Plan would begin accruing immediately and would do so at rates comparable to those under the Legacy Plan, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

## FOURTH CAUSE OF ACTION
### *Violation of ERISA § 204(g)*

169.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent cause of action as if fully restated herein.

170.    ERISA's "anti-cutback" rule prohibits amendments to a pension plan that eliminate or decrease accrued benefits, including early retirement benefits or retirement-type subsidies.

171.    This statutory protection extends to any participant who satisfies (either before or after the amendment) the preamendment conditions for the early retirement benefit or subsidy.

172.    Under ERISA § 204(g)(2), a participant who is not eligible for early retirement at the time of an amendment must be allowed to "grow into" eligibility for the early retirement benefits or subsidies under the preamendment terms of the plan.

173.    Before July 1, 1999, The Pension Plan for Non-Union Employees of Millard Fillmore Hospital provided for an actuarially reduced early retirement benefit to any participant between the ages of 55 and 64, who had at least 10-years of service and for an unreduced early retirement benefit to any participant between the ages of 62 and 64, who had at least 40-years of service.

174.    Because The Pension Plan for Non-Union Employees of Millard Fillmore Hospital capped service at 35-years, the unreduced early retirement benefit allowed a participant who had already accrued the maximum benefit under the plan to begin receiving such benefit, without any actuarial reduction, three years earlier than normal retirement age.

175.    Each participant who satisfies the preamendment age and service requirements of the unreduced early retirement benefit necessarily retains the right to begin distribution of such benefit.

176.    Defendants violated the anti-cutback provisions of ERISA where they distributed benefits in amounts that are less than the value of the benefits previously accrued by class members under their respective Legacy Plans prior to July 1, 1999.

177.    Additionally, Defendants violated the anti-cutback provisions of ERISA by eliminating the subsidized and/or unsubsidized early retirement options previously available to the Named Plaintiffs and class members under their respective Legacy Plans and/or by not including the value of such early retirement options in either the notational cash balance account or the calculation of the pension benefits at the time of distribution.

178.    Named Plaintiffs and/or class members have been damaged in amounts equivalent to the value of their lost accrued benefits.

179.    Accordingly, pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a),

1132(a),   Named Plaintiffs and the proposed class seek and are entitled to relief, including nullification of the Amendment, or reformation of the Amendment and/or the Plan to conform the terms to provide Named Plaintiffs and other class members with the benefits that they believed they were receiving under the Plan, to wit, that the accrued benefit under the new Cash Balance Provisions of the Plan would include and protect all previously accrued benefits under the Legacy Plan, including early retirement benefits, and that benefits under the Cash Balance Provisions of the Plan would begin accruing immediately and would do so at rates comparable to those under the Legacy Plan, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

### FIFTH CAUSE OF ACTION
### *Violation of ERISA § 502(c)*

180.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs as if fully restated herein.

181.     Defendants failed and/or refused to timely comply with Plaintiffs' numerous requests to produce plan documents which were either necessary for Plaintiffs to understand and assert their rights under the Plan or were instruments under which the Plan was established or operated and therefore required to be provided under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), and which are required to be disclosed within 30-days from such request.

182.     Plaintiffs first requested plan documents on February 12, 2019.

183.     Defendants did not provide a substantial, albeit still incomplete, response to Plaintiffs' requests until July 24, 2020, or 494-days after such disclosures were due.

184.     To date, Defendants have still not provided Plaintiffs with the requested copies of the Amendment(s) to the The Pension Plan for Non-Union Employees of Millard Fillmore Hospital, which purportedly froze accruals under such plan for all participants as of July 1, 1999

and created the terms of the cash balance provisions of the Plan.

185.    Defendants' repeated refusals and/or failures to provide timely or any responses to Plaintiffs' requests for documents have collectively caused Plaintiffs harm and warrant an imposition of penalties in the amount of $100 per day, pursuant to 29 U.S.C. § 1132(c)(1).

**WHEREFORE**, Named Plaintiffs pray that Judgment be entered against Defendants and that the Court award the following relief:

a. a declaration that Defendants have breached their fiduciary duties under ERISA;

b. an order certifying the class as requested and designating Christen Archer Pierrot, Esq., and Thomas & Solomon LLP as class counsel;

c. designation of Roxanne Cleary, Lisa Wendling, Kimberly Miller, Mary Clare Breidenstein, and Robin Chilton as Class Representatives;

d. judgment for Named Plaintiffs and the class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint;

e. an order enjoining the Plan Administrator from continuing to violate the law and/or the terms of the Plan including such terms of the Plan as are implied by law in the manners alleged or referenced in this Complaint or shown by the facts;

f. an order nullifying the Amendment or, in the alternative, reforming the Plan to bring the terms and administration of the Plan into compliance with the law, in all cases effective as of the date the alleged violations first occurred and taking into account all accrued benefits;

g. an order surcharging Defendants for the full amount for Named Plaintiffs and class members' benefits in order to make Plaintiffs whole;

h. following entry of predicate relief and/or reformation of the Plan that conforms its terms to the requirements of the law, a further order requiring Defendants to recalculate the benefit amounts due or past due under the terms of the Plan in accordance with the requirements of ERISA, and, where applicable, for the Plan to pay the difference, plus interest, to or on behalf of all class members who received less in benefits or benefit accruals than the amount to which they are entitled and/or to pay benefits to which class members are entitled in all applicable optional forms;

i.  an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Named Plaintiffs' and class members' rights pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

j.  an order awarding pre- and post-judgment interest;

k.  service payments for the Named Plaintiffs; and

l.  an order awarding, declaring or otherwise providing Plaintiffs and the class all other such relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that Plaintiff may subsequently specify and/or that the Court may deem appropriate.

Dated:  January 7, 2022

**THOMAS & SOLOMON LLP**

By:     _/s/ Adam T. Sanderson_____
J. Nelson Thomas, Esq.
Michael J. Lingle, Esq.
Jessica L. Lukasiewicz, Esq.
Adam T. Sanderson, Esq.
*Attorneys for Plaintiffs and Class Members*
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
mlingle@theemploymentattorneys.com
jlukasiewicz@theemploymentattorneys.com
asanderson@theemploymentattorneys.com

Christen Archer Pierrot, Esq.
*Attorney for Plaintiffs and Class Members*
3959 N. Buffalo Rd.
Orchard Park, New York 14127
Telephone: (716) 553-9899
cap@archerpierrot.com